## GOULD *v.* STATE

[No. 285, September Term, 1962.]

440

*Decided May 14, 1963.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

*Harry J. Goodrick* and *Charles M. Huester* for the appellant.

*Louis E. Schmidt, Special Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *J. Albert Roney, Jr., State's Attorney for Cecil County,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The appellant, a Negro convicted of the rape of a white woman by the court sitting without a jury, claims that his confession was involuntary because obtained by a threat to charge him with another crime of which he was innocent and, so, was improperly admitted into evidence to his prejudice.

On a February night in 1962 Miss Margaret Antone, a recluse living in Cecilton, was dragged from her home, badly

beaten about the head and face and raped while unconscious by two assailants, who left her, still unconscious, in the outhouse behind her dwelling. She has been since confined in institutions as a result of the attack and was not able to identify her attackers or testify at the trial.

Gould, the appellant, fled the State. On April 1, 1962, he returned and went to the county jail at Elkton and said he wished to give himself up. He then gave a statement, saying he "would like to get it off his chest * * *." In the statement, the voluntariness of which is not challenged, he said he drove from a beer garden with one Jenkins to the Antone house, and when the lady in the house came to the door, Jenkins "grabbed" her, and he, Gould, helped to hold her, put his hand over her mouth and dragged her out in the yard, where Jenkins raped her. Afterward, he and Jenkins carried her to the outside toilet and left her. He thought she was dead when they left her.

Gould was placed in jail. He and Jenkins, when confronted, each blamed the other for the beating and the rape; and each agreed to take a lie detector test. It was arranged that the tests be given by a State police expert on interrogations, one Sergeant Lough, at the State Police Barracks in North East.

On April 6, Gould was to go to the Barracks for the test. He decided he did not want to go, and the sheriff of Cecil County informed Lough, who replied, "Bring him down anyway." Gould then unprotestingly made the trip. He arrived at about twelve-thirty p. m., was put in a cell and given lunch. At one-thirty he went into a room with Lough, who interrogated him for about an hour, and then gave him a polygraph test.

The sheriff testified that Gould submitted to the interrogations and the test of his own free will and accord, after he had been told he did not have to do so unless he was willing. Lough's testimony was that he advised Gould that no one need take a polygraph test except voluntarily, that he could leave the room and be returned to the sheriff's custody any time he wished, and that it was after this advice that Gould voluntarily signed an agreement to take the test.

After Lough's interview was finished, he, Gould, and the sheriff went into another room where Gould gave a statement

which Lough typed. It recites that he is suspected of the An-
tone rape, that he has a right to answer and an equal right to
refuse to answer any question, and that any answer or state-
ment must be given freely, voluntarily and of his own will and
desire, with no promise of reward and no threat having been
made, and with full knowledge that anything he said could and
would be used against him in court. In the statement Gould
said that he hit Miss Antone half a dozen times and that he
and Jenkins both raped her. He concluded by saying his treat-
ment had been good at the Barracks and at the Elkton jail,
that he had not been threatened, and that he made the confes-
sion freely and voluntarily. He read the statement (he had
gone through the ninth grade at school), it was then read to
him, and he signed it.

Lough testified that Gould had told him in the interrogation
room before the polygraph test the same things he said in the
statement. The sheriff said from the stand that when they came
out of the interrogation room, Lough asked Gould if he did
not want to tell him, the sheriff, the same things he, Gould,
had told him. Gould's reply was to ask what the penalty was,
to say he was sorry it happened, and to make and sign the con-
fession.

Gould says that when Lough concluded the interrogation, he
told him the Cecil County judge hated liars and for him to go
out and shake hands with the sheriff and tell him he was sorry
he had not told him the truth. He says he did shake hands with
the sheriff before making the confession.

Gould contends that the confession was involuntary because
he went unwillingly to the Barracks and because, in the course
of the interrogation, Lough told him that a six-year-old white
girl had been raped in Rising Sun in December, and that if
he did not confess to the Antone rape, he would charge him
with the rape of the little girl. He says he made and signed
the confession only because of the threat to charge him with
the Rising Sun crime if he did not. "I didn't have any choice.
* * * I had to take one choice or the other."

Lough testified that the recital of a fictitious crime and the
questioning of the suspect as to connection with it in the course
of the invariable rehearsal for a polygraph test is standard pro-

cedure, designed and used for the protection of the suspect. He said: "The fictitious crime question is designed to indicate if a person has a guilt complex. It is a guilt complex reactor." He asked Gould if he had ever been in Rising Sun, and when Gould said no, he concocted a fictitious rape of a non-existent six-year-old girl who was supposed to live on the same street in Rising Sun as he, Lough, did. He merely asked Gould if he knew anything about such a crime and did not say or suggest that he committed or was connected with the crime.[1]

Lough had referred in his original testimony, before Gould testified, to the questions he had asked Gould about the fictitious crime. After Gould had testified, Lough was recalled. He swore he made no threat to Gould and that he did not tell him that unless he confessed to the Antone rape he would be charged with the Rising Sun crime. Thereafter, Judge Rasin cross-examined Lough thoroughly as to Gould's willingness to talk and to take the test, as to the advice Lough gave Gould as to his rights before the statement was given and signed, as to his willingness to make and sign the statement, and then said:

> "(The Court) I ask you again, did you, at the beginning or at any time during your conversation with him, tell him that if he took this test and gave a statement with respect to Miss Antone, that he would not be charged with the Rising Sun crime?
>
> "(The Witness) No, sir, I made no such statement to him.
>
> "(The Court) Did you tell him that if he did not take the test and did not give a statement that he would be charged with the Rising Sun crime?
>
> "(The Witness) No, sir, I did not."

When Gould was asked whether he made the statement freely

---

1. The appellant sought to prove that in December a Cecil County magistrate had found a man guilty of common assault on a three-year-old girl who lived not far from Rising Sun in an effort to show that Lough was threatening to charge Gould with a real crime. However, Gould testified he had not heard of the assault case until after the interrogation and confession, and Lough testified to the same thing.

and willingly, he said: "I wasn't so willing about it, but I made it." Again he said: "I made it. I don't know about how freely it was. I made it." When he was asked whether he indicated that anything was wrong in the statement when he read it over, he said:

> "I will put it I didn't see anything. There could have been something that wasn't correct, but I didn't see it. In my glance I didn't see it."

Judge Rasin ruled that although Gould did not want to go to the Barracks, when he got there he gave the interview to Lough and took the test of his own free will and accord, and that his confession was given and signed freely and voluntarily, without threat or coercion. The careful consideration we have given to the facts and circumstances revealed by the testimony and other evidence in the record, and to the legal and factual arguments in the briefs has led us to decide that the judgments reached by Judge Rasin were clearly permissible, and (without in any way suggesting we think he was) we cannot say he was wrong in his evaluation of the credibility and weight of the testimony of the witnesses he saw and heard, or in the conclusions he drew.

*Judgment affirmed.*